UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL S. THOMAS,<br><br>       Petitioner,<br><br>   v.<br><br>JOHN SUTTON, Warden,<br><br>       Respondent. | No. 1:17-cv-00205-DAD-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation serving a state prison sentence of 62-years-to-life for the attempted murder of his brother. He challenges his conviction, alleging defense counsel was ineffective in failing to request a jury instruction on attempted voluntary manslaughter. The Court finds that the state court rejection of the claim was not contrary to, or an unreasonable application of, Supreme Court precedent and recommends the petition be **DENIED.**

**I.    PROCEDURAL HISTORY**

On August 1, 2014, Petitioner was convicted of attempted murder involving the personal and intentional discharge of a firearm that proximately caused great bodily injury (Cal. Pen. Code §§ 187(a), 664, 12022.53(d); assault with a firearm involving the personal use of a firearm and personal infliction of great bodily injury (Cal. Penal Code §§ 245(a)(2), 12022.5(a), 12022.7(a)); and possession of a firearm by a felon (Cal. Penal Code § 29800(a)(1)). People v. Thomas, 2016

1

WL 4506103, at *1 (Cal. Ct. App. 2016). In addition, Petitioner was found to have suffered two prior serious felony convictions and served two prior prison terms under California's Three Strikes law (Cal. Penal Code §§ 667(a)(1), (b)-(i), 1170.12(a)-(d), 667.5(a)). Id. He was sentenced to prison for a total unstayed term of 10 years plus 52-years-to-life. Id.

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA"). Id. On August 29, 2016, the Fifth DCA affirmed the judgment. Id. Petitioner then petitioned for review in the California Supreme Court, and the petition was summarily denied on November 16, 2016. Id.

On February 13, 2017, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on June 1, 2017. (Doc. 15.) Petitioner did not file a traverse.

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[1]

> As of March 24, 2014, Steven Thomas (Thomas), defendant's brother, resided in an apartment complex on Saginaw, in Fresno. [FN2] Defendant and the brothers' mother lived in different apartments in the complex. Defendant drove a white Chevrolet Caprice. At trial, Thomas denied having a disagreement with defendant, in the days leading up to March 24, about a white paint transfer on Thomas's girlfriend's car. Thomas also denied having any disagreement with defendant about how defendant was disrespecting their mother, although they had had such a discussion in the past. Thomas denied getting into an altercation with defendant a day or so before March 24; they merely had "an issue."
>
> > [FN2] Unspecified references to dates in the statement of facts are to the year 2014.
>
> Around 6:00 a.m. on March 24, Thomas heard a knock at his apartment door. He did not see who it was. He went outside and saw "a random person" and asked if he had knocked, but the person said no, and so Thomas went back inside. He subsequently took out his trash. Because he threw away something he needed to retrieve, he came out twice. The first time, he saw defendant sitting outside defendant's apartment. The second time, Thomas did not see defendant. He saw some men, but they were too far away for him to identify. None called out to him, and no words were exchanged. He turned away, then felt something hit him. At the same time, he heard gunshots. He ran without looking back. He was struck in the back and both legs. [FN3]
>
> > [FN3] Three expended cartridge casings were found at the apartment

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

complex. Two of the shell casings were stamped ".45 auto," meaning they were .45-caliber ammunition. The third casing appeared to be the same caliber. There were no fingerprints on the casings.

Thomas made it as far as the medical center on Dakota, "a pretty good block or two" from his apartment. There, he sat down. People came to help him, but he "blank[ed] out" a bit. He did not recall what he said, other than that he had been shot and was in a lot of pain. When he was talking, he did not lie about what had happened.

On March 24, Eric Munoz was a security officer at the Sierra Community Health Center on Dakota. Around 7:20 or 7:25 a.m., he came in contact with Thomas, who was near the health center entrance. Thomas's leg was bleeding and members of the medical staff were assisting him.

In response to Munoz's questions, Thomas gave his name, said he had been shot by his brother (whose name he also gave), and told where it had happened. He said he and his brother were arguing because his brother was cussing at their mother. When the argument went nowhere, Thomas walked away. That was when he got shot with a .38 caliber handgun. A police officer and emergency personnel then arrived; Munoz turned the information over to the officer, and Thomas was transported to Fresno Community Regional Medical Center (CRMC) in Fresno.

Fresno Police Officer Garza followed Thomas to CRMC and spoke with him about 20 to 30 minutes after arrival. Although Thomas had an IV in his arm and was complaining about pain, his eyes were open and he appeared to respond coherently to Garza's questions. Thomas was alert and angry.

When Garza asked what happened, Thomas said his brother Michael shot him. [FN4] Thomas said they had been arguing over the last couple of days. He thought defendant was disrespecting their mother, calling her names and things, and he told him to stop doing that. Thomas said the night before, they got into a wrestling-type fight. Nobody threw a punch; they were just on the floor, wrestling.

> [FN4] At trial, Thomas stated that when he spoke to Garza, he was traumatized and on medication. He assumed it was defendant who shot him because of past arguments they had had. Months earlier, they had argued over defendant borrowing a little money on occasion and Thomas wanting it back. Also, defendant had shot Thomas in the toe in 1992. Defendant did not shoot him on March 24, however.

Thomas told Garza that he was in his apartment around 6:00 that morning when defendant knocked on the front door. Thomas ignored him. Between 7:00 and 7:30 a.m., Thomas walked out of the apartment to discard the trash. As he was walking away from the trash cans, defendant came up and said he had been waiting up all night for Thomas. Defendant then pulled a gun that Thomas thought was a .38- or .40-caliber, and pointed it at Thomas. Thomas was shocked. He was not sure what to do, but then decided to turn around and run away. As he was running, he heard several gunshots and felt bullets striking his body.

Fresno Police Detective Miranda and his partner, Detective Fenstermaker, responded to the hospital around 10:00 a.m., after being briefed by officers on scene at the apartment complex. Miranda spoke with Thomas, who was being treated in the emergency room. Thomas was upset, angry, and in a lot of pain. He was, however, very coherent.

3

| | |
|---|---|
| 1 | During the interview (an audio recording of which was played for the jury), Thomas said what happened was the "same shit" as happened 15 years earlier, with defendant disrespecting people and their mother, and Thomas asking defendant to "chill out" a little. Thomas said he did not think defendant was trying "to do it," but was just trying to scare him. [FN5] Thomas related that the day before, Thomas's girlfriend's car was hit. Thomas asked defendant about it; defendant said he did not care. Thomas thought defendant did it. |

[FN5] Miranda believed Thomas was referring to the earlier shooting.

Thomas related that at about 7:15 that morning, he saw defendant walking away. Thomas already knew what was happening. He thought maybe, if he went outside with defendant, defendant would "chill out." [FN6] He decided to take out his trash on the way. When Thomas reached the gate by his apartment, defendant started walking toward him. They exchanged words, and Thomas laughed about it. Thomas felt defendant was trying to make his mind up to do what he needed to do. Defendant pulled out a revolver Thomas believed was .38-caliber. When Thomas saw the pistol, he turned around and ran. He felt shots and kept running. He did not know if defendant got into a car, as he did not look back. Defendant did have a white Caprice, however.

> [FN6] Thomas explained that defendant had threatened him, but Thomas felt all defendant had to do was leave their mother alone, and they could "still be cool."

At the conclusion of the interview, Miranda returned to the police department and printed out a photograph of defendant. He returned to the hospital about 11:15 a.m. Thomas was at the same location and seemed the same physically and in terms of being coherent. During Miranda's second interview of Thomas (an audio recording of which was played for the jury), Thomas identified the photograph as being defendant, whom he described as "[t]rip pin [sic] off what happened" the day before. Thomas confirmed they had been arguing about defendant disrespecting their mother, but said he did not believe he got the best of defendant and did not hurt him.

Fresno Police Detective Harrell was assigned to look for defendant's white Chevrolet Caprice. There were several locations in Fresno to which police thought the vehicle might go. One of the addresses, at which defendant previously had been contacted, was in the 3900 block of East Woodward.

At 10:30 a.m., Officer Potts contacted Harrell and said he had located the vehicle in the parking lot at that location. When Harrell arrived, he began surveillance to see if defendant arrived or left or if the vehicle left. Harrell also kept an eye on apartments 201 and 202. He saw a man, who resembled defendant, and a woman walk into the parking lot, then toward the stairwell that led to those apartments. There was another man outside, and the three appeared to have a conversation. The man who resembled defendant and the woman then went up the stairs toward one of the two apartments.

A short time later, Harrell used the loud speaker from a police car to identify himself as a police officer and to call defendant by name to step out of the apartment. This went on for some time with no contact, but finally the person Harrell had seen earlier on the stairwell in front of apartment 202, walked out with a baby in his arms. He came downstairs as directed, and was contacted and detained. Defendant then came out as directed. He cooperated with police and was

4

taken into custody. He was unarmed. This was at least 30 minutes after the car was identified. [FN7]

> [FN7] No gun was found at the crime scene, in the Caprice, or in the apartment at which defendant was located. Miranda, who was the lead detective in this case, was notified at 2:00 p.m. that defendant was in custody. Fenstermaker requested that a gunshot residue (GSR) test be conducted on defendant. Scott West, a supervisor in the Fresno Police Department's Crime Scene Investigation Bureau, collected a GSR kit around 4:40 that afternoon, but did not know it was ever tested. As far as Miranda knew, no gunshot residue was found. West explained that the ability to find GSR diminishes as time passes; hence, no residue being found did not necessarily mean the person tested did not fire a gun.

In the two weeks following March 24, Thomas telephoned Miranda four to five times a week and also sent him text messages with questions about the case. He also thanked Miranda a couple of times for helping him with the arrest. He was upset and said he could not believe his brother had tried to kill him.

Thomas, 2016 WL 4506103, at *1–3.

### III. DISCUSSION

A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

5

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.  Review of Petition

Petitioner alleges his defense attorney was ineffective in failing to request jury instructions on attempted voluntary manslaughter. He also alleges defense counsel was ineffective in failing to represent him to the full extent of his abilities, failing to advise him that he was a former prosecutor, failing to investigate witnesses, and failing to properly represent him in a Marsden hearing. As correctly noted by Respondent, these other instances of ineffective assistance were never presented to the state courts and are unexhausted.

Petitioner presented his claim concerning the failure to request jury instruction on direct appeal. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Defense counsel originally requested that the court instruct on attempted voluntary manslaughter, based on sudden quarrel/heat of passion and on imperfect self-defense, as a lesser included offense of attempted murder, as charged in count 1. During the instructional conference, the trial court stated it saw no basis for instructing on any form of self-defense; however, there was some basis for heat of passion in Thomas's testimony. Defense counsel agreed. The prosecutor stated he did not know, but "tend[ed] to agree." After discussion of unrelated issues, the following occurred:
>
> > "[DEFENSE COUNSEL]: Your Honor, if I did request lessers I am withdrawing my request. Obviously, the court can do it sua sponte, but I'm not requesting lessers, at least felony lessers. [¶] ... [¶] ... [I]n terms of what the evidence shows, ... I believe there is enough to allow for an instruction on voluntary under, as we stated previously, under a theory of heat of passion. However, I'm not specifically asking for it. [¶] ... [¶] ... In other words, the court can do it sua sponte but I'm not asking for it because, frankly, any one felony will expose my client to life exposure. I don't want

7

to give them more felonies to consider."

Defendant now contends the trial court erred by failing to instruct sua sponte on attempted voluntary manslaughter, based on sudden quarrel/heat of passion, as a lesser included offense of attempted murder. He says the failure to do so violated his state and federal due process rights to a fair trial and to present a defense, and created incomplete instructions on the mens rea of attempted murder. Alternatively, defendant claims, defense counsel was ineffective for failing to request such an instruction.

We conclude an instruction on attempted voluntary manslaughter was not warranted by the evidence. Accordingly, we need not determine whether the doctrine of invited error applies. Nor do we need to address defendant's claim of ineffective assistance of counsel, since it necessarily follows that defendant cannot establish he was prejudiced by counsel's omission. (See *People v. Avila* (2009) 46 Cal.4th 680, 705; *People v. Dennis* (1998) 17 Cal.4th 468, 540-541; *People v. Daniels* (1991) 52 Cal.3d 815, 868.)

"[A] trial court must, sua sponte, or on its own initiative, instruct the jury on lesser included offenses 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 194-195, fn. omitted.) "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could ... conclude[ ]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) " '[S]peculation is not evidence, less still substantial evidence. [Citation.]' [Citation.]" (*People v. Dennis, supra*, 17 Cal.4th at p. 508.)

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citation.] Moreover, ... the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*People v. Breverman, supra*, 19 Cal.4th at pp. 162-163, fn. omitted.) "This means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent." (*Id*. at p. 163, fn. 10.) Doubts as to the sufficiency of the evidence to warrant such instructions are resolved in favor of the accused. (*People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12, superseded by statute on another point as stated in *In re Christian S*. (1994) 7 Cal.4th 768, 777.)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on [a] lesser included offense ... should have been given. [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that ... is ... predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22

Cal.4th 690, 733.) [FN omitted]

"[T]he offense of attempted murder is reduced to the lesser included offense of attempted voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion. [Citations.]" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; accord, *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.) [FN9] "An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' [citation], and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition ... to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."' [Citations.]" (*People v. Breverman, supra*, 19 Cal.4th at p. 163.) "[T]he passion aroused need not be anger or rage, but can be any "'[v]iolent, intense, high-wrought or enthusiastic emotion'" [citation] other than revenge [citation]." (*Ibid.*)

> [FN9] We rely on cases involving the reduction of murder to voluntary manslaughter for the applicable legal principles. For our purposes, there is no meaningful difference between the completed crime and an attempt, although we recognize attempted voluntary manslaughter, unlike voluntary manslaughter, requires an intent to kill. (Compare *People v. Lasko* (2000) 23 Cal.4th 101, 108 with *People v. Montes* (2003) 112 Cal.App.4th 1543, 1546-1547.) Because of this requirement, defendant's suggestion the injuries inflicted in this case support the inference he lacked the intent to kill and so were more consistent with attempted voluntary manslaughter than attempted murder, is based on a legally erroneous premise.

"Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59 (plur. opn. of Baxter, J.).) The victim's provocative conduct may be physical or verbal (ibid.), and "provocation can arise as a result of a series of events over time" (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245).

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As [the California Supreme Court] explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele, supra*, 27 Cal.4th at pp. 1252-1253.) In other words, the victim's conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee, supra*, 20 Cal.4th at p. 59 (plur. opn. of Baxter, J.).) [FN10]

> [FN10] There is no additional requirement that an ordinary person of average disposition "would act rashly in a particular manner, namely, by

9

killing." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

Examining the evidence presented at trial in the light most favorable to the giving of an instruction on attempted voluntary manslaughter (see *People v. King* (1978) 22 Cal.3d 12, 15-16), we find that even assuming a reasonable juror could conclude the subjective component of the heat of passion requirement was shown, there was no evidence from which it could be concluded the objective component was shown. At most, the evidence showed defendant may have hit Thomas's girlfriend's car with his own vehicle not long before the shooting; defendant and Thomas argued months earlier about money defendant owed Thomas; they argued about defendant disrespecting their mother over the course of several days before, and the morning of, the shooting; they had a wrestling-type fight, in which no punches were thrown, the night before the shooting; and Thomas ignored defendant when defendant knocked on his door the morning of the shooting. Neither these sorts of arguments or this kind of minor physical tussle rise to the level of provocation necessary to support an instruction on attempted voluntary manslaughter. (Compare *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 [verbal argument in which the defendant and victim cursed at each other, followed by scratching and kicking, insufficient] & *People v. Bloyd* (1987) 43 Cal.3d 333, 350 [the defendant and victim quarreled over course of evening and into early morning; "totality of those verbal assaults" did not constitute evidence of provocation sufficient to reduce homicide to manslaughter] with *People v. Elmore* (1914) 167 Cal. 205, 207-209, 211 [evidence at most proved manslaughter where fatal wound inflicted solely as result of sudden heat of passion excited in the defendant by unprovoked attack and violent blows struck by victim, which included grabbing the defendant by the throat and whirling him around] & *People v. Thomas* (2013) 218 Cal.App.4th 630, 645-646 [jury should have been instructed on voluntary manslaughter due to sudden quarrel or heat of passion where just before shooting, the defendant was involved in heated argument and physical altercation with victim and victim's two companions; the defendant lost the fight and may have been dragged across parking lot].) Although we may speculate the interactions between defendant and Thomas were more heated or physical than Thomas admitted, "[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense. [Citations.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 941; accord, *People v. Rogers* (2009) 46 Cal.4th 1136, 1169.)

Defendant says the absence of an instruction on attempted voluntary manslaughter created incomplete instructions on the mens rea of attempted murder, in that the jury was not adequately instructed that the prosecution bore the burden of proving the absence of heat of passion beyond a reasonable doubt. The prosecution must, of course, prove all elements of the charged offense beyond a reasonable doubt (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278), and jury instructions relieving the prosecution of this burden violate a defendant's due process rights (*Carella v. California* (1989) 491 U.S. 263, 265). Accordingly, the due process clause "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented* in a homicide case." (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704, italics added; accord, *People v. Rios* (2000) 23 Cal.4th 450, 462.) The issue is not "properly presented," however, where, as here, the evidence was insufficient to entitle defendant to an instruction on attempted voluntary manslaughter because it did not raise a reasonable doubt as to whether the attempted homicide was malicious. (*People v. Najera* (2006) 138 Cal.App.4th 212, 225; *People v. Brooks* (1986) 185 Cal.App.3d 687, 696; *People v. Hyde* (1985) 166 Cal.App.3d 463, 473-475; see *People v. Moye* (2009) 47 Cal.4th 537, 563-564 (dis. opn. of Kennard, J.); *People v. Breverman, supra*, 19 Cal.4th at pp. 187, 189-190 (dis. opn. of Kennard, J.).)

Thomas, 2016 WL 4506103, at *4–6.

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that

standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

In this case, Petitioner fails to establish either component of the Strickland test. First, Petitioner fails to show that counsel erred by failing to request the instruction. As the appellate court reasonably concluded, there was insufficient evidence of heat of passion to merit an instruction. Therefore, Petitioner was not entitled to the jury instruction, and counsel cannot be faulted for failing to make it nonmeritorious request. Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).

In addition, defense counsel made a strategic decision not to request instructions on attempted voluntary manslaughter. Counsel stated his reason was "because, frankly, any one felony will expose my client to life exposure. I don't want to give them more felonies to consider." Thomas, 2016 WL 4506103, at *4. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. Petitioner fails to show how counsel's decision was unreasonable.

Even if counsel were deficient, Petitioner has failed to establish prejudice, which is fatal to his claim. See Hein v. Sullivan, 601 F.3d 897, 918 (9th Cir. 2010) ("As [petitioner] must satisfy both [deficiency and prejudice] prongs in order to prevail under Strickland, we may dispose of his claim if he fails to satisfy either prong of the two-part test."); Sangathe v. Maass, 314 F.3d 371, 380–81 (9th Cir. 2002) ("We need not consider whether trial counsel's investigation of this issue was deficient, however, because this argument fails at the prejudice prong of Strickland."). The Fifth DCA reasonably found that there was insufficient evidence to merit the instruction. Therefore, there can be no prejudice for failing to request an instruction that was inapplicable.

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the Strickland standard. The claim should be rejected.

With respect to his various other claims of ineffective assistance, Respondent correctly argues that they were never presented to the state courts and are therefore unexhausted. 28

U.S.C. § 2254(b)(1). In addition, the claims are entirely conclusory. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994).

## V. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **September 1, 2017**         **/s/ Jennifer L. Thurston**
                              UNITED STATES MAGISTRATE JUDGE